UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>FLUOR CORPORATION,<br><br>　　　　Defendant. | Case No. 10-cv-05105-WHO<br><br>**ORDER REGARDING MOTION FOR CLARIFICATION**<br><br>Re: Dkt. No. 261 |

## INTRODUCTION

On August 7, 2015, I granted Fluor Corporation's motion for partial summary judgment that The Shiloh Group, LLC ("TSG") is a liable person under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") section 107(b) and that several of TSG's affirmative defenses were meritless. Dkt. No. 260. TSG then asked that I clarify whether its statute of limitations defense, which Fluor did not originally address in its motion but which I discussed in my Order after TSG raised it in opposition to the motion, was also barred. To insure a complete record, I allowed both sides to brief the issue. Further oral argument is unnecessary and I VACATE the hearing set for October 14, 2015. I have reviewed the respective briefing and GRANT Fluor's motion that TSG's affirmative defense regarding the statute of limitations is meritless.

## BACKGROUND

The material facts in the case are not in dispute. TSG is the owner of the industrial and commercial property at 930 Shiloh Road in Windsor, California that has a history of environmental contamination. Dkt. 232 at 1. Fluor owned and conducted industrial operations on that property from approximately 1952 to 1969, when it sold the property to Encodyne.

The California Department of Toxic Substances Control ("DTSC") became aware of the

contamination of part of the property ("the Pond Site") in or about 1985. A layer of shale was spread over the contaminated soil and asphalt was laid on top of that. In 1989, the DTSC issued a Consent Order that directs Fluor to prepare a "complete remedial investigation and feasibility study" in order to identify and evaluate the contamination, evaluate an appropriate response, and gather the information necessary to prepare a remedial action plan ("RAP"). Dkt. No. 273-1 [Consent Order][1]. In 1997, Fluor began drilling injection wells and soil vapor extraction point in order to inject ozone into the soil and reduce the levels of contaminants. The treatment continued for years and resulted in the material diminution of the contaminants.

TSG was formed and acquired the property at issue in 1999.

In 2011, DTSC approved a remedial action plan for the Pond Site that set soil cleanup goals. Subsequently, DTSC requested that Fluor develop and submit a modified RAP in 2014. DTSC approved Fluor's amended RAP on September 8, 2015, which calls for the excavation of the contaminated soil.

## DISCUSSION

At the heart of the disagreement between the parties is whether the present action is a removal action, which must be brought "within three years after completion of the removal action," or a remedial action, which must be brought "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2). It is undisputed that any removal action is not complete. Dk. No. 260 at 7. Therefore, the three-year statute of limitations for removal actions has not yet started, much less expired.

TSG argues that Fluor's response has always been a remedial action and that the operative date for the commencement of the statute of limitations is 1997, at the latest. Brief at 4-7 [Dkt. No. 273]. Thus, under TSG's interpretation, Fluor's statute of limitations would have expired in

---

[1] TSG's request that I take judicial notice of (1) the 1989 Consent Order, (2) the 1991 amendment to the Consent Order,(3) the Revised Draft Remedial Action Plan for Ecodyne Pond Site Soil Remediation and (4) Fluor's Answer and Counterclaim [Dkt. No. 202] is GRANTED. Dkt. No. 273.

1  2003, making its January 2015 claims time barred.² Brief at 2. Fluor contends that the six year

2  statute of limitations on remedial actions applies and began to run in 2011, when the DTSC first

3  approved the original RAP, and that its response before that time should be characterized as a

4  removal action. Resp. at 1 [Dkt. No. 277].

5       42 U.S.C. § 9601(23) defines removal as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such **actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health** or welfare or to the environment, which may otherwise result from a release or threat of release.

11  42 U.S.C. § 9601(23) (emphasis added). Removal actions are typically described as "time

12  sensitive responses to public threats." *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1228

13  (9th Cir. 2005); *see also Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp.*, 38 F. Supp.

14  2d 802, 810 (N.D. Cal. 1999) ("Removal refers to short-term action taken to halt the immediate

15  risks posed by hazardous wastes.") (internal citations omitted).

16       By contrast, 42 U.S.C. § 9601 defines remedial action as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

20  42 U.S.C. § 9601. Unlike removal actions which are generally seen as short term actions,

21  "remedial actions are designed to achieve a permanent remedy." *Carson Harbor Vill., Ltd. v.*

22  *Unocal Corp.*, 287 F. Supp. 2d 1118, 1155 (C.D. Cal. 2003)*; see also Exxon Corp. v. Hunt*, 475

23  U.S. 355, 360 (1986) (remedial actions under CERCLA are "measures to achieve a 'permanent

24  remedy' to a particular hazardous waste problem"); *City of Moses Lake v. United States*, 458 F.

---

² TSG also appears to argue that a previous action, the pouring of asphalt over the contaminated soil, could also qualify as a permanent solution consistent with remedial action. Brief at 5. TSG approximates that the paving occurred "in or about 1988" and therefore the statute of limitations would have expired in 1994. Brief at 7, n. 5. For the purposes of TSG's position, both interpretations lead to the same conclusion, that Fluor's January 2015 claims are time barred.

Supp. 2d 1198, 1212 (E.D. Wash. 2006) ("The one consistent thread in the decisions dealing with whether an action is remedial or removal in nature is that removal actions generally are immediate or interim responses, and remedial actions generally are permanent responses.")(internal quotation marks removed).  A removal action is generally taken before a remedial action.  *Advanced Micro Devices,* 38 F. Supp. 2d at 810.

TSG argues that because "there was no emergency" and Fluor's response was deliberate and consistent with the permanent remedy, Fluor's actions from 1997 and earlier should be characterized as remedial.  Brief at 5.  TSG focuses on the "initiation of physical on-site construction" language in CERCLA's statute of limitations and offers two triggering dates: (1) in approximately 1985, when the layer of shale and asphalt was spread over the contaminated soil or (2) in 1997, when Fluor constructed wells to inject ozone into the soil to diminish the contaminants.  Brief at 5, 7.  In choosing these dates, TSG appears to take a literal interpretation of the statute language by focusing on the facts that the selected actions were (1) physical construction (2) on the disputed site.  For example, TSG supports its selection of the 1997 action by describing that "the ozone injection system obviously had to be constructed, and was on site. [W]ells have to be drilled to install/construct such a system[,] [t]he evidence therefore shows that there was physical on-site construction of the remedial action on the Pond Site in 1997."  Brief at 7.

However, both of those dates precede the adoption of either the 2011 or 2015 RAP.  The Ninth Circuit has explicitly interpreted 42 U.S.C. § 9613 to hold that "the initiation of physical on-site construction of the remedial action can only occur after the final remedial action plan is adopted."  *California ex rel. California Dep't of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661, 667 (9th Cir. 2004)(internal quotation marks omitted).  In *Neville*, the court explained that in order for an action to be remedial action, and therefore be consistent with permanent remedy, a plan for a permanent remedy must already have been adopted.  *Id*.  Because neither party can ever know for sure if an action is remedial until a permanent remedy is determined, "[i]n this case, as in most cases, the permanent remedy was selected when the final RAP was approved."  *Id*.

TSG argues that *Neville* limited its holding to suits involving governmental oversight. Brief at 8. However, the Ninth Circuit explicitly addressed cases involving non-governmental parties, finding that when "non-governmental parties conduct the clean-up of a site without governmental or agency oversight and then pursue response costs under CERCLA, there will most likely still be a remedial action plan in place." *Id*. at 667, n.3. Although *Neville* declined to address the statute of limitation in cases involving only private parties, here, Fluor's response has been under a Consent Order issued by DTSC, it has been supervised by DTSC, and DTSC approved a RAP in both 2011 and 2015. Under *Neville*, the statute of limitations would not begin until 2011 at the earliest.

The two cases TSG cites to support its interpretation of *Neville*, *City of Moses Lake* and *W.R. Grace & Co*, actually support Fluor's argument. *City of Moses* involved a dispute between the City of Moses Lake and the United States over contaminates in the city's water supply that were potentially due to manufacturing at the location by a United States' contractor. 458 F. Supp. 2d at 1205-06. It addressed the issue left open in *Neville* – when the statue of limitations commences in cases involving private parties. *Id*. at 1211. The court ultimately decided that the statute began running when the City of Moses adopted its own private report and action plan, which constituted "Moses Lake's 'remedial action plan.'" *Id*. at 1214. *City of Moses Lake* declined to adopt the earlier date the defendants offered as the "physical on-site construction" date because the city's "remedial action plan" had not been issued at that time. *Id*. Although inapplicable in this case because DTSC has approved a RAP for Fluor's response action, *City of Moses Lake* reaffirms *Neville*'s basic holding that the statute of limitations does not begin until a final remedy is approved.

In *W.R. Grace & Co*, the court found that cases that addressed the interplay between removal and remedial actions under CERCLA were of "limited use" because of the unique facts at issue in its case. 429 F.3d at 1236 n. 17. Nonetheless, it reiterated that *Neville* concluded "that for the purposes of the onset of the limitations period for recovery of remedial action costs under CERCLA, no action can be remedial until adoption of a final remedial action plan." *Id*.

TSG also attempted to distinguish *Advanced Micro Devices*, where the court held that no

remedial action could take place until a final remedy design was issued. 38 F. Supp. 2d at 813. TSG asserts that *Advanced Micro Devices* is inapplicable based on differences between the duration and size of the clean up actions. Brief at 9. But *Advanced Micro Devices* did not hinge its opinion on the complexity of the response; instead, the court considered "several factors [that] assist in the characterization of an action as 'removal' or 'remedial': (1) proximity to disclosure of the final remedial design, which may occur prior to approval of the final remedial plan; (2) whether RI/FS monitoring and testing are ongoing at the time of the action; (3) whether the action falls within the statutory definition of "removal" (or "remedial"); and (4) the action's role in the implementation of the permanent remedy." 38 F. Supp. 2d at 812. Notably, in considering the fourth factor, the court stated that "the design of the final remedy had not been developed or disclosed when the extraction wells were installed at the Site in 1986, and there is no evidence that they were disclosed before September 1991 [the date of RAP issuance]. The fact that the extraction activities ultimately did not turn out to be 'short-term,' because they were implemented in the final remedy four years later, cannot now be considered in hindsight." *Id*. at 813. This directly addresses and contradicts TSG's argument that because the ozone injections involved physical construction, they should trigger the statute of limitation for remedial actions. That an action involves physical construction on the disputed site, even if it coincides with subsequent permanent remedy, is insufficient to trigger the statute of limitations for remedial actions. In this case, the wells are not even consistent with the final remedy, as the final RAP calls for the decommissioning and removal of the wells so that the soil evacuation can take place. Resp. at 8.

TSG cites a string of cases that it argues have analogous facts and support the conclusion that Fluor's conduct should be treated as a remedial action. Brief at 6. However, many of these cases either pre-date *Neville* or follow Second Circuit precedent that adopts a different rule than the Ninth Circuit. For example, in *Schaefer v. Town of Victor*, 457 F.3d 188, 207 (2d Cir. 2006), the Second Circuit explicitly refuses to adopt the bright line rule "that approval of a final remedial action plan is the sine qua non for the initiation of remedial action," as adopted in *Neville*. *See also Douglas Autotech Corp. v. The Scott Fetzer Co*., No. 07-cv-1062, 2008 WL 205217 (W.D. Mich. Jan. 23, 2008) (following the precedent established in *Schaefer*); *Yankee Gas Servs. Co. v.*

*UGI Utilities, Inc.*, 616 F. Supp. 2d 228 (D. Conn. 2009) (same).  In so far as the Second Circuit may have disagreed with the Ninth Circuit, I am bound to follow *Neville*.

Similarly unpersuasive is TSG's citation to *State of California on Behalf of California Department of Toxic Substances Control v. Hyampom Lumber Co.*, 903 F. Supp. 1389 (E.D. Cal. 1995).  *Hyampom* rejected the proposition that remedial activity could not begin prior to the approval of permanent remedy.  *Id*. at 1392; *see also Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 892 (S.D. Ohio 2012) (relying on *Hyampom* for the proposition that remedial action can be taken before a final plan is adopted).  However, *Hyampon* is a district court case that was decided pre-*Neville* and is inconsistent with it.  I follow *Neville*.

As Fluor argues, its actions leading up to the RAP are more properly considered removal actions, which can be used to evaluate and assess potential longer term clean up options.  42 U.S.C. § 9601(23); *see also Advanced Micro Devices*, 38 F. Supp. 2d at 810 ("During the removal action phase, a site posing a risk of hazardous waste release is studied and various cleanup options considered.")  In this case, that is exactly what the 1988 Consent Order dictates: it specifies that a "temporary asphalt" cover should be laid over the contaminated area.  Consent Order at 29.  This temporary measure is consistent with categorizing the asphalt placement as a short-term removal action. The Consent Order also directs the implementation of a "Remedial Investigation" and "Feasibility Study" intended to determine the nature and extent of the contamination and to identify and evaluate any appropriate responses. *Id*. at 30-31.  It is undisputed that the purpose of ozone injections was to demonstrate the feasibility of the in-situ ozonation as a possible component of the final remedy.  Resp. at 7.  Simply because the injections required physical on-site construction does not trigger the statute of limitations.  No final RAP or remedy was in place at the time.  The action is more appropriately categorized as an interim removal action intended to evaluate the effectiveness of such a measure.

## CONCLUSION

TSG does not have a valid affirmative defense that the statute of limitation bars Fluor's

causes of action. Fluor's motion for summary judgment on this issue is GRANTED.[3]

**IT IS SO ORDERED**.

Dated: October 14, 2015

_____
WILLIAM H. ORRICK
United States District Judge

---

[3] Fluor's requests that I strike: (1) the Declaration of Bill Wiggins and its attached Exhibit 1 [Dkt. Nos. 271-2 and 272-2]; (2) certain portions of the Declaration of Brian Carter [Dkt. No. 273]; (3) Exhibit D of Declaration of Brian Carter [Dkt. No. 273-4]; and (4) the facts asserted in the Consent Order [Dkt. No.273-1] are MOOT because I did not rely any of those documents, or identified portions therein, in deciding this order. Brief at 9.

8